UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ENRIQUE HOLLINS | No. 20 CR 577-7<br><br>Judge Elaine E. Bucklo |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Enrique Hollins and others worked a call-up narcotics delivery phone line to distribute fentanyl-laced heroin and crack cocaine to customers on the west side of Chicago. Hollins worked the phone over several months, after having previously been convicted of narcotics-distribution offenses. Accordingly, the government respectfully requests that the Court impose a sentence at the low end of the applicable Guidelines range of 87 to 108 months' imprisonment.

**I.   PRESENTENCE INVESTIGATION REPORT**

The government agrees with the Guideline calculations set forth in the Presentence Investigation Report submitted by the United States Probation Office. Hollins's total offense level is 27 and his criminal history category is III, resulting in an advisory Guidelines range of 87 to 108 months' imprisonment with a five-year mandatory minimum sentence. PSR ¶¶ 24-36, 44-51, 100-101.

**II.   NATURE AND CIRCUMSTANCES OF THE OFFENSE**

   **A.   Offense Conduct**

As admitted in his plea agreement and noted in the PSR, from approximately April 23, 2020, through approximately September 1, 2020, Hollins conspired with his 15 co-defendants and others to distribute controlled substances, specifically fentanyl-

laced heroin and crack cocaine, to customers primarily on the west side of Chicago. This narcotics-trafficking conspiracy involved the drug trafficking organization managed and operated by co-defendant Dexstin Bryant (the "Bryant DTO"). The Bryant DTO used telephone number (312) XXX-4490 (the "DTO Phone") as a call-up narcotics delivery phone line. Workers for the Bryant DTO took shifts answering the DTO Phone, which was pre-programmed with customer numbers, took orders for narcotics placed by customers over the DTO Phone, and delivered the ordered narcotics to those customers.

Co-defendant Johnnie Grant operated the Bryant DTO's stash house out of his residence, which was located on the 800 block of South Karlov Avenue in Chicago, Illinois (the "Grant Residence"). The Grant Residence served as the headquarters for the Bryant DTO, and the place where shift workers commonly transferred the DTO Phone at the beginning and end of their shifts, delivered proceeds from narcotics sales that were coordinated using the DTO Phone, and picked up or dropped off narcotics that were to be sold to customers who ordered narcotics using the DTO Phone. HOLLINS worked the DTO Phone beginning no later than June 14, 2020, passing the phone to other conspirators when he was not in possession of it. HOLLINS acknowledges that, as part of his responsibilities as a worker, on August 17, 2020, he transferred the DTO Phone, narcotics, and narcotics proceeds to another conspirator at the Grant Residence at the end of his shift.

More specifically, on June 14, 2020, Hollins and co-defendant Bryant had two telephone conversations during which Bryant instructed Hollins to meet with co-defendant Shauntrell Harris in order to obtain the DTO Phone so that Hollins could sell narcotics to customers using the DTO Phone. During one of the calls, Bryant told Hollins that Harris would let Hollins know when to pick up the DTO Phone from Harris.

Additionally, on August 17, 2020, Hollins went to the Grant Residence to drop off the DTO Phone, narcotics proceeds, and narcotics to co-defendant Grant after Hollins worked a shift with the DTO Phone. In particular, at approximately 8:31 a.m., Hollins and Grant had a telephone conversation during which Grant asked, "What's it looking like?" Hollins responded, "I got 6 DVDs," referring to heroin, "and 4 CDs," referring to crack cocaine. Hollins later said, "I need to get the money out the car," referring to narcotics proceeds from sales coordinated using the DTO Phone. At approximately 8:33 a.m., Hollins and Grant had a telephone conversation during which Grant instructed Hollins to "bring me everything," referring to the DTO Phone, narcotics proceeds, and narcotics. At approximately 9:52 a.m., Hollins arrived at the Grant Residence and gave Grant, who was at the Grant Residence, the DTO Phone, narcotics, and narcotics proceeds.

Moreover, on August 25, 2020, Hollins sold fentanyl-laced heroin to an undercover law enforcement officer ("UC-4") posing as a DTO Phone customer. Specifically, on August 25, 2020, at approximately 8:22 a.m., UC-4 called the DTO

3

Phone, which Hollins answered, in order to purchase narcotics and arranged for the transaction to take place at the parking lot of a supermarket located on the 2000 block of West Madison Street in Chicago, Illinois. During the call, Hollins asked, "how many," referring to how much narcotics UC-4 wanted to buy. UC-4 responded, "I got 100," referring to $100. Hollins then asked, "you need soft," referring to heroin, "or hard," referring to crack cocaine. UC-4 replied, "soft." At approximately 8:43 a.m., Hollins arrived at the parking lot of the supermarket in a vehicle he was driving. About one minute later, at approximately 8:44 a.m., Hollins exited his vehicle and entered the vehicle UC-4 was in. Hollins then asked, "how many you wanted," and UC-4 responded, "I got a hundred," referring to $100. Hollins replied, "let's see what we got," and then handed UC-4 ten baggies of fentanyl-laced heroin in exchange for $100. The ten baggies that Hollins sold to UC-4 contained approximately 3.404 grams of fentanyl-laced heroin.

### B. The Amount of Drugs the Bryant DTO Distributed.

As the above admissions reveal, Hollins was a regular worker of the DTO Phone. As noted in the PSR, the narcotics distributed by the Bryant DTO using the DTO Phone were packaged in small zip lock baggies that were priced at $10 per baggie. PSR ¶ 11. During its investigation of the Bryant DTO, law enforcement completed approximately 22 undercover purchases of fentanyl-laced heroin and 8 undercover purchases of crack cocaine that were arranged through the DTO Phone. *Id.* ¶ 12. The average weight of each baggie of fentanyl-laced heroin that was sold to

4

law enforcement during those 22 undercover purchases was 0.352 grams, and the average weight of each baggie of crack cocaine that was sold to law enforcement during those 8 undercover purchases was 0.072 grams. *Id.* During monitoring of the DTO Phone over the course of 27 days in August 2020, law enforcement conservatively determined that 641 baggies of fentanyl-laced heroin and 1,211 baggies of crack cocaine were sold during that time period, which meant that an average of 23.74 baggies of fentanyl-laced heroin and 44.85 baggies of crack cocaine were sold each day. *Id.* Using the average daily number of baggies sold and the average weight of each baggie, the government calculated that Hollins and others sold approximately 8.35 grams of fentanyl-laced heroin (23.74 baggies/day x 0.352 grams per baggie) and 3.22 grams of crack cocaine (44.85 baggies/day x 0.072 grams per baggie) each day using the DTO Phone, for a total of 659.65 grams of fentanyl-laced heroin and 254.38 grams of crack cocaine that was sold between June 14, 2020, and September 1, 2021—the time that Hollins was involved with the DTO Phone. *Id.* ¶¶ 24-27.

The narcotics distributed throughout the time Hollins was involved in the conspiracy were reasonably foreseeable to him because his co-conspirators distributed the same narcotics in the same locations, received instructions from the same managers (Bryant, Brent, and Grant), and used the Grant residence as the DTO's stash house and headquarters. *See United States v. Lomax*, 743 F. App'x 678, 682 (7th Cir. 2018) (reasonable foreseeability "does not require that a coconspirator

5

be aware of the precise quantity involved in each of an ongoing series of illegal transactions'"); *United States v. Miller*, 834 F.3d 737, 742 (7th Cir. 2016) (joint criminal activity may be shown where dealers share customers, swap selling duties, and travel together to sell drugs); *United States v. Melendez*, 819 F.3d 1006 (7th Cir. 2016) (defendant pled guilty to conspiracy to distribute heroin and therefore 'is liable 'for the reasonably foreseeable quantity of drugs sold by his or her co-conspirators.'") (citation omitted).

Hollins expressly admitted in the Plea Agreement to having known the general workings of the conspiracy, as well as that many other players were involved, acknowledging "that, between June 14, 2020, and September 1, 2020, Hollins and others whose actions were (a) within the scope of the jointly undertaken criminal activity, (b) in furtherance of that activity, and (c) reasonably foreseeable to Hollins distributed fentanyl-laced heroin and cocaine base to DTO Phone customers each day." Plea Agmt. ¶ 6; *see also* Application Note 5 to Guideline § 2D1.1 ("If the offense involved both a substantive drug offense and an attempt or conspiracy (*e.g.*, sale of five grams of heroin and an attempt to sell an additional ten grams of heroin), the total quantity involved shall be aggregated to determine the scale of the offense."); Guideline § 1B1.3(a) ("[T]he base offense level where the guideline specifies more than one base offense level . . . shall be determined on the basis of the following . . . in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether

or not charged as a conspiracy), all acts and omissions of others that were—(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction").

Hollins actively participated in the conspiracy in June and August 2022. As a result, Hollins should be held accountable for the narcotics sold using the DTO Phone from the first day of his involvement in the conspiracy, June 14, 2020, to the end of the charged conspiracy, September 1, 2020, and not just for the narcotics Hollins personally sold using the DTO Phone, as the government expects Hollins will argue at sentencing. The Probation Office has adopted the government's calculation of the daily drug distributions and the total amount of drugs for which Hollins should be held accountable. PSR ¶¶ 24-27.

## III. DEFENDANT'S HISTORY AND CHARACTERISTICS

Hollins's background, which provides both mitigating and aggravating circumstances, supports a sentence at the low end of the Guidelines range. As detailed in the PSR, Hollins admittedly had a "good" upbringing with two loving parents who provided for him. *Id.* ¶¶ 66-74. Hollins was not abused as a child, maintains good relationships with his parents and siblings, and noted that none of his family members have any criminal history. *Id.* However, in speaking of his childhood, Hollins acknowledged that he was raised on the west side of Chicago, where he was exposed to gang violence and drug activity. *Id.*

Hollins clearly got enveloped in that drug activity based on his prior convictions. Hollins is no stranger to the criminal justice system, and his record demonstrates that he does not respect the law and has thus far shown no intention of becoming a law-abiding citizen. Hollins is well on his way to being considered a serial drug dealer. Hollins has been convicted in possession of ten baggies of suspected heroin/fentanyl (*id.* ¶ 45) and for selling heroin/fentanyl to undercover officers on three separate instances in February and March 2018 (*id.* ¶¶ 46-48). Hollins also has a conviction for domestic battery after he reportedly threw a brick at a victim's vehicle and hit another victim in the mouth. *Id.* ¶ 44. As a result, while Hollins is only 26 years old, he already has three convictions not including the instant case.

### IV. A SENTENCE AT THE LOW END OF THE GUIDELINES RANGE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY FOR THIS DEFENDANT

Based on the nature and circumstances of the offense, as well as the history and characteristics of this defendant, this case presents compelling needs to protect the public, as well as for general deterrence. A sentence at the low end of the Guidelines range would strike an appropriate balance between all of the competing factors Hollins's case presents.

Day after day, Hollins and his co-conspirators distributed poison to members of his community, without concern for the harm that it caused them. While Hollins was not a leader/manager of the operation, his work with the DTO Phone

8

nevertheless significantly contributed to the problem. Over the past few years, Chicagoans have seen an enormous increase in opioid abuse. The number of emergency medical encounters involving naloxone or Narcan—a common indicator of an opioid overdose—rose by about 50 percent between 2013 and 2017. Ill. Dep't of Public Health, Div. of Emergency Med. Services, *Opioid Overdose Semiannual Report* 1 (2019), http://www.dph.illinois.gov/ sites/default/files/publications /010219oppsopioid-semiannual-report.pdf. More recently, the total number of deaths in Illinois attributed to an opioid overdose increased 32.7% from 2,219 deaths in 2019 to 2,944 deaths in 2020. Ill. Dep't of Public Health, *Opioid Overdose Semiannual Report*(2021), https://dph.illinois.gov/content/dam/soi/en/web/idph/publications/idph/ topics-and-services/opioids/idphdata/idph-semiannual-opioid-report-august-2021.pdf

The opioid problem is particularly severe in the Chicago area compared to the state, region, and other large cities. From January 2018 to December 2020, there were 4,283 opioid-related deaths in Cook County with nearly 82% of those deaths from June 6, 2020, through December 23, 2020, showing the presence of fentanyl in their systems, which is what Hollins and his co-conspirators primarily sold to customers. *See* https://www.cookcountyil.gov/news/cook-county-opioid-overdoses-2021-set-surpass-2020-numbers.

## V. SUPERVISED RELEASE CONDITIONS

Supervised release is important in this case to ensure that Hollins does not turn again to drug distribution or other criminal behavior. The government requests

9

that the Court impose a four-year term of supervised release, which is within the Guidelines range and recommended by the Probation Officer. PSR ¶ 105. The government also agrees with the conditions recommended by the Probation Officer. *Id*. at 23-28.

## VI. CONCLUSION

For the foregoing reasons, a sentence at the low end of the Guidelines range of 87 to 108 months' imprisonment, along with a four-year term of supervised release and a $100 special assessment, is fair, reasonable, and sufficient, but not greater than necessary, to comply with the purposes of sentencing.

    Respectfully Submitted,

    MORRIS PASQUAL
    ACTING UNITED STATES ATTORNEY

By:    /s/ *Prashant Kolluri*
    PRASHANT KOLLURI
    Assistant United States Attorney
    United States Attorney's Office
    219 South Dearborn, 5th Floor
    Chicago, Illinois 60604
    (312) 886-9085

Dated: March 17, 2023